Good morning, Your Honors. May it please the Court, I am Ina Lipkin on behalf of the petitioner, Virginia Papazyan, who is in removal proceedings from a denial of asylum with holding a removal and relief under the Convention Against Torture by the Immigration Judge. The case was affirmed by the Board with that opinion. Therefore, the Immigration Judge's decision is the final agency decision that I am arguing. Petitioner has established a claim for relief. She established persecution by both Azerbaijani, Armenian, and Russian authorities. She established it depending upon her credibility. Yes, Your Honor, that is correct. And this respondent did testify in a passionate and credible manner, which the IJ erroneously mischaracterized as combative. Respondent was an elderly woman. She was about 70 years of age at the time of the hearing, not very sophisticated, Your Honors, not very educated. And that, I believe, would account for some of the so-called demeanor issues that the Immigration Judge found fault with. In fact, the respondent credibly established that she was persecuted by both ethnic extremists in Azerbaijan, Armenia, and Russia, and that the governments of those three respective countries were either unwilling or unable to protect her from harm or, in the alternate themselves, participated in harming her. For example — I suppose the case really boils down to whether we should sustain the credibility finding of the Immigration Judge. The Immigration Judge indicated 10 areas of concern, any one of which, if we're sustainable, the credibility is lost. And it seems to me your case would be lost. So if you wouldn't mind, could you focus on the areas where the — at least three of them, sometime during your remarks. The medical treatment issue, where she testified once she was rejected for medical treatment because of her ethnicity, but on the other hand, that she was one month and 15 days in a hospital with 20 stitches. The IJ thought that was incredible and not believable. The second on her husband, she said she was a widow. Then she didn't know where he was. Then she was able to find him, according to the IJ, as soon as records were necessary. She was able to telephone him. And then the third was the two-year difference in when she was raped. Those seem to be the three strongest grounds. Maybe you could help us out with those. Yes, Your Honor, certainly. As regards to the first issue, Your Honor, could you remind me one more time? I'm sorry. I'm a little nervous. The first issue that you mentioned. That was on the medical treatment issue. Yes, Your Honor. Thank you. Respondent, in fact, did testify in a consistent manner. She had received or attempted to receive treatment at two different time periods on this record. The first time was in the Hrazdan camp in Armenia. The second time was in Sochi City in Russia. So she testified that at the Hrazdan camp, they refused her medical treatment because of her ethnicity. But she said that in Russia, she did receive a brief amount of treatment. However, upon discovery of her ethnicity by the hospital officials, she was thrown out of the hospital before she fully completed her treatment. So I think that the judge didn't fully give those two incidents their sufficient notice and consideration. Testimony located. One moment, Your Honor. Okay. Okay. Administrative record, page 82. She indicates that she lost her consciousness after an attack. Her husband called an ambulance. You know, Your Honor, I misspoke. It was in Azerbaijan that she was refused treatment due to her ethnicity. And I write that she was denied treatment after the ambulance authorities realized that she's of Armenian ethnicity. In one of them, you say she said she was not fully treated. Mm-hmm. That's right, Your Honor. But two sentences before that, she says that she testified she was in a hospital for a week to 10 days. Yes, Your Honor, but she, I think. She was treated, but she was in a hospital for a week to 10 days. Right. I think that the respondent's lack of sophistication was related to the fact that she couldn't, she didn't concretely explain that she was denied treatment after the realization that she was Armenian. And I believe that she tried to relate to the court that had she been of the same ethnicity as the people treating her, then she would have received her full course of treatment. Yeah. Okay. So based upon that, then the IJ has to decide whether her explanation is sufficient to overcome what appears to be contradiction under sworn testimony.  Right. Based upon that record. Because I don't believe her statements were an attempt to exaggerate her claim or make her claim more endearing to the judge. She simply related that she received some treatment, but not the full course of treatment that she should have gotten. As concerning the second grounds, and that is the whereabouts of her husband, respondent had credibly testified. If it is an inconsistency, was it an inconsistency between the written application and the later testimony as opposed to an inconsistency during the course of testimony? Yes, Your Honor. I believe that the written application, which was not prepared by an attorney, simply didn't flesh out fully the details of her claim. And upon being sworn to the truth of the contents of the application, she then related with the most accuracy that she could recall the exact periods of time of her treatment. My question was focused on the second of the three Judge Wallace identified, and that is her husband. Right. Missing, dead, can't find. Is the inconsistency here between the written application and the testimony, or is it within the four corners of the testimony? Your Honor, I believe that at the time she submitted her application in early 2000 Which of the two is it? Why don't you start with that? Okay. Is it an inconsistency between what was in the written application and what she testified to, A, or, B, is it internal to the testimony? Your Honor, I believe it's A with some modification. I want to explain why. At the time she filed her asylum application, she did not know her husband's whereabouts. She could have easily written that he was in Russia, but I don't have contact with him. She didn't have to write that she thought he was dead. And it was only later that year, in later 2000, that she was able to get information as to his whereabouts by writing to a friend, their mutual friend in Russia. Again, this is not a factor that enhances her claim. Because, again, she could have easily written where her husband was if she actually knew. And it is her duty to present the most accurate facts in the case. And she had amended her application before she swore to its contents before the immigration judge. Did she indicate in her application she was a widow? Right, because she believed that her husband had been killed at the Hrazdan camp. So she thought her husband was dead. That's right. Later, she learned that that, in fact, was not the case. But the ALJ was somewhat concerned because this came up during, as he said, why didn't you tell me earlier that you had communicated with him by telephone? The ALJ was concerned about what happened during the testimony. Should that concern us? Your Honor, it's true that it seems like a great contradiction. She says that she's a widow. Suddenly she's not. But, again, this isn't enhancing her claim. She only learned of his whereabouts later in the year after filing for asylum. And she indicated to the judge, okay, I know where he is, and I'm going to explain to you how I came upon that knowledge. You have about a minute left. Did you want to save some time for rebuttal? I want to say one thing about the third point, and that's the dates. Your Honor, this is such a small inconsistency that doesn't go to the heart of the claim. She explained that conflicts began in Baku, Azerbaijan, in 1990, and that they continued for some period of time. And it was only in 1992 that she had experienced the persecution. She explained, I made a mistake. The application was incorrect. It should have been 92. I think in light of her other credible testimony,  as her testimony surrounding the circumstances of what happened to her was credible. Thank you so much. Thank you. You've got a minute or so left. Counsel, we'll hear from the government at this time. May it please the Court. My name is Ernesto Molina with the U.S. Department of Justice's Office of Immigration Litigation, and I represent the Respondent Alberto Gonzalez in this case. In this case, the Court confronts an alien who failed to meet her burden of convincing an immigration judge that she provided credible testimony in support of her asylum application. This Court's review is governed by the substantial evidence test, meaning that before this Court, Ms. Papasan must present evidence so compelling that no reasonable fact finder could fail to find that she was credible. She cannot do that. It's not been done in the opening brief. And there's certainly evidence to support the immigration judge's decision. I've read some of our cases that haven't quite said that as the test. What do you rely on? Fisher? Fisher would be the test, Your Honor. I also audit cases such as Singh-Cower v. INS. Singh? Singh-Cower to help distinguish from other Singh cases. I think that's 183 F. 3rd, 1147. But the credibility test in this Court has generally always been the substantial evidence test. Now, this Court has made some articulation requirements by the immigration judge, that the immigration judge has to provide cogent reasons, specific reasons for finding the person not to be credible. But those do not alter the substantial evidence test. In this case, we have an immigration judge who listed at least about ten grounds for not believing Ms. Papasan. And the evidence does help to support that particular articulation of the facts. Which of the ten grounds in your judgment go to the heart of the claim? Well, several of them. That is our law, isn't it? Yes, Your Honor. This Court has stated that any inconsistencies or any credibility issues must relate to the heart of the claim. Explain to me how the difference between 1990 and 1992 goes to the heart of the claim. Well, Your Honor, that goes to the reliability of the witness in this particular case. This witness gave two different dates at two different times for that rape. Explain to me how that two-year difference goes to the heart of the claim. The two-year difference does not go to the heart of the claim, Your Honor. No, it doesn't. Let's move to the next one. But, Your Honor, I haven't finished my answer to your prior question. The two-year difference itself is not the issue. The issue of whether the rape occurred at all is the issue. Because there's a difference in dates, the immigration judge began to believe that it was made up or set up to be an enhancement of this claim. In particular, in the application, it was made to coincide with the genocide events in Azerbaijan, which would certainly help to lend greater credence to our allegation of a rape. Two years later, not quite as likely, and, therefore, she's enhancing her claim by moving it up to the genocidal date of January 14, 1990. That's how it relates to the heart of the claim. And so your answer is different than you started with. At the start of your answer, you said it didn't go to the heart of the claim. Now your answer is that it does? No, Your Honor. The fact that there's a – the fact of a two-year difference itself is not what creates the heart of the claim issue. The fact of whether the event occurred at all, in light of the alteration of facts, the shifting between facts, the inconsistencies between the allegations, that is what goes to the heart of the claim. Did the rape occur at all? So I'm giving a more full explanation to Your Honor. Okay. Now explain to me how, whether she has a husband, doesn't have a husband, whether he's missing, or dead, goes to the heart of her asylum claim. The basis for the claim to persecution. Certainly. If someone's claiming to fear persecution in Azerbaijan and Armenia is the issue before the court, then certainly if one claims that one husband has been killed, certainly goes to the heart of the claim. In fact, this court has held – So he was killed or he was dead? Actually, if you read her application at, I believe it was page 182 of the administrative record, you've got the application actually saying that he was killed because he was Azerbaijani. Therefore, that obviously goes to the heart of the claim, as this court has held that asylum applications can be based on death of close family members and treatment that close family members get. Now, if I can follow the court's reasoning and then pick up on the third reason that had been laid out before this court, which was the – allow me to flip a page – the hospitalization issue. There is a plain inconsistency in what was asserted regarding the obtaining hospital care in Armenia. Now, those contradictions are found at page 88 of the testimony, where she claimed to have been hospitalized for 15 days to one month, and page 186 of the asylum application, where she claims that after being beaten in the camp in Armenia, she was denied medical treatment. This is a plain inconsistency, which in the application can be seen as an enhancement, but certainly is a deviation from what was written in the application. And therefore, it goes to the heart of the claim that the treatment she received from the Armenian government, from which you heard before this court, she also claims to have been mistreated. That all goes to the heart of the asylum claim. She was given 15 to 20 days of medical care. In fact, she admitted – actually, 15 to 30 days. She, in fact, admitted she didn't have to pay for the medical care while she was at the hospital camp. This contradicts clearly what was in the asylum application, therefore provides substantial evidence for the immigration judge's decision. Do we know who prepared the asylum application? Yes, Your Honor. It was a man whose last name was Petrosian. Also, this gentleman provided certified translations of the letters that Ms. Petrosian had prepared or submitted. She indicated that she had no communication problems with the gentleman and therefore it would seem to be a fairly reliable document. She told him that her husband was missing, and he interpreted that as him being dead. Well, that would be a third statement, Your Honor. In one case, it's I don't know. You just told me that she said she had no problem with the translation, but now you're telling me that she did testify that she told the person who filled out the application her husband was missing, which that individual interpreted as the husband being dead. That sounds like a problem with the interpretation to me. No, the problem is that the story kept on leaping before the immigration judge, Your Honor. The immigration judge had a story in the asylum application that her husband had been killed. Again, there was no evidence that she fixed that allegation before the asylum officer. And with all of that, we then get the testimony regarding how she began to find out about her husband, when she found out about her husband. Did she initially contact her husband's friend? Did the husband's friend call her out of the blue? Did the asylum officer testify? No, Your Honor. Do we have his notes? No, Your Honor. The notes are not in the ---- So how do we know what she told the asylum officer? The immigration judge ---- the counsel for INS brought it up and asked her about it in cross-examination. And there ---- Do you think the content of a question asked in cross-examination is being true? Yes, Your Honor. If she's admitting to what was said before an asylum officer ---- If a defendant takes the stand in a normal criminal trial and the prosecutor gets up to cross-examine and says, isn't it true that you stabbed your husband 60 times in a fit of rage, on review we would take the content of that question as being accurate, true fact? Oh, no, Your Honor. Please don't misunderstand me. I'm not suggesting that the content of the question itself is what was raised. I'm sorry. If that's what I said, that's not what I meant at all. The only basis upon which the content of what she told the asylum officer was contained in a question asked by the government counsel on cross. And ---- There were no notes, no testimony from the asylum officer, nothing to indicate what she had told the asylum officer other than what was inside the four corners of the question asked on cross. Is that right? Almost, Your Honor. In addition to the testimony that Your Honor cites, there is the asylum application, which under presumption of regularity was reviewed by that asylum officer. And Ms. Pafsayan admitted that she did not correct the asylum officer on that matter. Therefore, she's there presenting her case to the asylum officer. It can be inferred, and the fact finder is permitted to infer. In fact, under substantial evidence, this Court is supposed to make every inference to the fact finder's benefit. The immigration judge could find that she was representing before the immigration ---- before the asylum officer that her husband had been killed. Okay. I understand your argument. Now, I see that I'm running out of time quickly. And I know that I've addressed at least the three major problems that were brought up, and I'll have to rely on the brief for the remainder because I don't want to take too much of the Court's time. But if I may sum up. Sure. In this case, there is, again, substantial evidence to support the immigration judge's adverse credibility finding. There are at least a few clear inconsistencies between the asylum application and Ms. Pafsayan's testimony. These go to the heart of the asylum claim, and therefore, the immigration judge's decision is supported by substantial evidence, and this Court should form the immigration ---- should affirm the immigration judge's decision. I'm sorry, Your Honor. How do you find the asylum application in the record? It's in and around page 180 and on the following pages, Your Honor. Thank you. Thank you for your argument. Thank you. Rebuttal? Yes, Your Honors. I just want to remind the Court that at the time of the asylum interview and filing of the application, Respondent still did not know the whereabouts of her husband. So, therefore, there's no inconsistency there in regards to she knew that he was alive but didn't mention it at the asylum interview. She clearly stated on the record that she believed he was missing, presumed dead. And at the beginning of the individual hearing, when corrections were being made before testimony began, she indicated she knew that he was alive. Thank you. All right. Thank you both for your argument. The case just argued to be submitted for decision.
judges: Wallace, Hawkins, Thomas